IN THE UNITED STATES DISTRICT COURT FOR
THE WESTERN DISTRICT OF MISSOURI

| | |
|---|---|
| **DRE HEALTH CORPORATION,**<br>**Plaintiff,**<br>v.<br>**BERKLEY EQUITY LIMITED & ANTHONY LYONS,**<br>**Defendants.** | **Case No.:** ___________ |

ECF DOCUMENT
I hereby attest and certify this is a printed copy of a document which was electronically filed with the United States District Court for the Western District of Missouri.
Date Filed: 1/18/22 Paige A. Wymore-Wynn, Clerk
By: [signature], Deputy Clerk

**COMPLAINT**

DRE Health Corporation, by and through its undersigned counsel, and for its causes of action against Defendants Berkley Equity Limited (hereinafter "Berkley") and Anthony Lyons, states as follows:

1. Plaintiff DRE Health Corporation (hereinafter "DRE") is a Missouri Corporation authorized to conduct business in the state of Missouri.

2. Upon information and belief, Defendant Berkley is a foreign corporation or other business entity with its principal place of business in the British Virgin Islands and none of its members or owners are residents of the state of Missouri.

3. Defendant Anthony Lyons is an individual that is not a Missouri resident and who may be personally served at his residence in the town of Avon, state of Colorado.

4. This Court has subject matter jurisdiction over the case, personal jurisdiction over defendants, and venue is appropriate as follows:

   a. under Title 28 U.S.C. section 1332 as there is complete diversity of citizenship between Plaintiff and Defendants;

b. venue is proper in this court and this court has personal jurisdiction over Defendants pursuant to Berkley's specific agreement and consent to the exclusive venue and jurisdiction for the resolution of any dispute or suit arising between DRE and Berkley to be within the state or federal courts of Jackson County, Missouri, as agreed to in the New Customer Application dated September 2, 2021, which was executed by Defendant Lyons. A true and accurate copy of the New Customer Application (the "Initial Agreement") executed by Defendants Berkley and Defendants Lyons is attached hereto and incorporated herein as Exhibit A.

5. The Initial Agreement, signed by Lyons, states in pertinent part, as follows:

> "The applicant warrants the information supplied above to be true, and agrees that information set forth on this form may be shared with affiliates of DRE Health Corporation ("DRE"), including other members of the DRE Corporation family of companies. The Applicant authorizes DRE Health Corporation, to investigate the references herein, statements or other data obtained from Applicant or from any other person pertaining to the Applicant's credit and financial responsibility. The Applicant agrees to abide by the Standard Terms of Sale published regularly by DRE, as shown on DRE's invoices, or by any other terms of sale upon which DRE and the Applicant should agree in writing. The Applicant agrees to pay interest on past due accounts at the highest rate permitted by law, together with attorneys' fees and all other costs and expenses incurred by DRE in collecting such accounts. The Applicant agrees that all payments to which DRE is entitled shall be paid to DRE at its offices in Kansas City, Missouri. The Applicant agrees that the laws of Missouri shall govern all transactions between DRE and the Applicant, that exclusive venue and jurisdiction of any dispute or suit arising between DRE and the Applicant shall lie within the courts of the State of Missouri, and the Applicant hereby consents to the jurisdiction of the Missouri courts in any such dispute or suit. NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from

> any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this credit is the Federal Trade Commission, Division of Credit Practices, 6th and Pennsylvania Avenue, NW, Washington, D.C. 20580."

6. Additionally, Venue is appropriate as set forth in Section 20.1 of the "Terms and Conditions of Sale – DRE Health" which were explicitly agreed to by Berkley. A copy of the Terms and Conditions of Sale – DRE Health is attached hereto as Exhibit B.

7. DRE and Berkley entered into a Memorandum of Understanding that was titled the "Sale & Purchase Agreement" ("SPA") effective September 2, 2021 which described a general agreement whereby DRE would sell large quantities of personal protective equipment (PPE), specifically 5 million boxes of blue surgical masks (or 250 million blue masks) and 1 million boxes of black surgical masks (or 50 million blacks masks) per week, to Berkley, and Berkley agreed to pay for the same. A copy of the SPA is attached hereto as Exhibit C.

8. Additionally, the SPA states on page 9 of 11 that Berkley agreed to be bound by the executed New Customer Application which Berkley submitted to DRE, and such application incorporates the DRE Health terms and conditions set forth in attached Exhibit B.

## FACTS COMMON TO ALL COUNTS

### SPA Signing, The Boxed Production Contract, and Efforts Taken in Immediate Reliance on the Same

9. DRE is a medical supply business which, among other things, manufactures and/or provides Personal Protective Equipment (PPE) to various medical entities and other medical suppliers.

10. DRE and Berkley entered into a SPA effective September 2, 2021, whereby DRE would sell large quantities of PPE, specifically 5 million boxes of blue surgical masks and 1 million

boxes of black surgical masks to be delivered pursuant to a subsequent and "more precise" schedule, to Berkley, and Berkley agreed to pay for the same.

11. Annex B to the SPA states that "Once the Initial Deposit is received a more precise schedule will be confirmed based on current orders in the system…"

12. Paragraph 6 (d) of the SPA provides that delivery schedules are provided in good faith and "no penalty charges for late deliveries outside of the time estimated will be accepted."

13. Berkley made the anticipated Initial Deposit on September 3, 2021. Acting in reliance on same, DRE both began working feverishly to build a factory that could meet the output demands of the SPA and, pursuant to Annex B, issued an Invoice and production schedule to Berkley.

14. In particular, DRE sent Berkley an Invoice no. 279722, dated September 15, 2021, ("the Boxed Production Contract") which related to the PPE being sold to Berkley under the SPA, and among other things, provided a schedule and price and stated in clear terms that payment was due in full upon cargo (*i.e.* the PPE) being available for pickup. A copy of the Boxed Production Contract is attached hereto as Exhibit E. The total price of the contract was $184,800,000.

15. Berkley received the Boxed Production Contract and did not reject its terms and they paid the first deposit after receiving the Boxed Production Contract.

16. Pursuant to the schedule provided in the Boxed Production Contract, the first shipment was to be ready on October 7-15, 2021.

17. Though DRE worked overtime to meet the schedule laid out in the Boxed Production Contract, it was not quite able to meet that schedule. Therefore, an Addendum dated October 19, 2021 agreed to by DRE and Berkley was added to the SPA. A copy of the addendum is attached hereto as Exhibit D. DRE entered into the Addendum in a showing of good faith despite

not being in any kind of breach of the SPA and despite Berkley agreeing to charge no penalties for late deliveries.

18. The Addendum provides for certain liquidated damages and states "Any damages are contingent upon Buyer's continued full performance under the SPA." See para 2 (a) (i) of Addendum.

19. DRE's terms and conditions, attached as Exhibit B, provide in section 11.3: In the event that the Company has a well - founded fear that the Customer will not fulfil his obligations, the Company shall at its discretion be entitled to require sufficient security from the Customer with regard to the fulfilment of the obligations to pay, before performing or continuing to do so," and further provides that "The Company shall be entitled to suspend the fulfilment of its obligations until the Customer has given said security."

20. Section 11(o) of the SPA on page 9 of 11 provides that in the event of any conflict on payment schedule or terms, the terms of the Invoice or Purchase Order shall govern.

21. As described, after entering into the Boxed Production Contract, which required production of massive volumes of PPE, DRE naturally needed to build a new factory and production facility to meet the demands of the Boxed Production Contract. This was made known to Berkley throughout the process.

22. DRE worked tirelessly to build a new manufacturing facility to meet the PPE production requirements of the Boxed Production Contract. In this pursuit DRE spent tens of millions of dollars. This fact was repeatedly made clear to Berkley, who knew at all times that DRE was acting in reliance on the various contracts.

23. While DRE was unable to initially meet the production demands of the Boxed Production Contract, it quickly built up the capacity to produce the required volume of goods and informed Berkley on numerous occasions that the first shipment was ready to be picked up.

24. In particular, DRE informed Berkley via text and other messaging services throughout the second half of October that the Boxed Production Contract PPE were ready to be picked up. Then, to leave no doubt, counsel for DRE sent letters to counsel for Berkley on both November 1, 2021 (Exhibit F) and November 4, 2021 (Exhibit G) making clear that the product was ready to be picked up and that DRE was invoking the right to payment under the terms of the Boxed Production Contract.

25. In particular, in the November 1, 2021 letter, counsel for DRE expressly and unambiguously stated that "pleased be advised that the first shipment is available for pickup today and payment is therefore due." (Exhibit F)

26. Counsel for DRE followed up three days later on November 4 after the product still had not been picked up despite it being unambiguously required under the terms of the various agreements. Counsel made clear that "[t]he bottom line is that DRE is performing under this contract and insists that Berkley does as well. The product just needs to be picked up. Further delay only exacerbates problems, as production must slow." (Exhibit G)

27. The DRE terms and conditions, attached in Exhibit B, provide in section 11.2 that in the event that Berkley alleges to have a claim of breach against DRE with regard to the performance of the agreement, Berkley will not be discharged from its obligation to pay in the manner agreed.

28. Berkley responded to DRE's demands that the product be paid for and picked up by engaging in a strange series of deflections, one day arguing about the location of the factory,

the next complaining about the location listed on certificates, another arguing for rights to inspection not contemplated by the Boxed Production Contract, and then claiming, without any evidence, that DRE was simply mistaken that the production was ready to be picked up.

29. Eventually, in December, Defendants actually did arrange for and inspect the Boxed Production PPE, even though they are housed in a secure facility. Upon information and belief, the inspector found the masks met all contract requirements.

30. Nevertheless, even after passing Berkley's inspection, Berkley still failed to arrange for pickup and pay for the massive amount of product that DRE continued to store for Berkley.

31. Throughout November and December, and despite the fact that it was false and not grounded in any kind of basis, Berkley continued to insist that DRE was unable to meet the capacity demands notwithstanding the fact that DRE could meet the capacity demands.

32. Regardless, under the terms and conditions, the first shipment was due for payment when it was available for pick up in October and certainly by November 1, 2021, the date of DRE's letter to Berkley. Berkley failed to make payment in material breach of the terms of the Boxed Production Contract and SPA.

The China Production

33. While the new manufacturing facility was being built, in good faith DRE offered to Berkley, and Berkley accepted, an order of certain masks of Chinese origin to fill Berkley's needs while it waited for the production facility's completion. To that end, DRE sent Berkley an Invoice no. 279723, dated September 10, 2021, (the "China Production Contract"), which related to the PPE being sold to Berkley which were coming from China and among other things, stated in clear terms that payment was due in full upon cargo customs clearance in the USA. A copy of the invoice is attached hereto as Exhibit H.

34. The total price of the China Production Contract was $11,000,000 for 500 million masks. Again, that invoice was subject to DRE's terms and conditions which required payment when the goods were ready for pickup, which they were at the time the invoice was sent.

35. The goods under the China Production Contract cleared customs and on September 30, 2021, DRE provided to Berkley documentation substantiating of such clearance.

36. The goods under the China Production Contract have been at all times available for pickup and on numerous occasions Berkley has promised DRE that payment for same was forthcoming. Despite the goods being available for pickup, Berkley has not paid for the China Production nor picked up the goods made available for pickup.

37. Despite the PPE goods clearing customs, Berkley has not paid for the goods under the China Production Contract.

38. Despite being contractually obligated to send funds for the China Production, in late November of 2021, Berkley advised it was refusing to wire funds to DRE which were due to be paid by Berkley unless DRE signed yet another document which changed the terms of the SPA and the executed Addendum to remove reference to DRE's invoices and the DRE terms and conditions.

39. Upon information and belief, Berkley insisted on removal of the reference to DRE's invoices and terms and conditions because it knew it was in material breach of same.

40. Later, after DRE refused to agree to another Addendum unless and until Berkley began acting in good faith, Berkley again repeatedly said that it was, in fact, sending payment for the China Production. Payment was never sent.

Berkley's Repeated Un-kept Promises and Reliance on the Same

41. During the time period of September – December, 2021, the Defendants have repeatedly made statements to DRE indicating that they intended to abide by and honor both the terms of the Boxed Production and SPA and the agreement to sell the China Production. DRE relied on these statements to its substantial detriment.

42. In particular, in reliance on the size of the Boxed Production Contract and the representations of Defendants Berkley and Lyons, DRE acquired and outfitted and staffed a factory in California to meet the delivery requirements of the Boxed Production Contract.

43. DRE borrowed monies from lenders at high rates to accomplish this rapid build-up of equipment and labor. At all times Berkley and co-defendant Lyons were aware that DRE was borrowing heavily to meet the requirements of the Boxed Production Contract, and at no point in time did the Defendants tell DRE to stop or that the Boxed Production Contract was off or terminated.

44. Upon information and belief, Defendants plan was to make money on both the Boxed Production and China Production deals by brokering agreements with third party Buyers. Defendants claimed to have Buyers lined up to purchase the masks at issue in both the Boxed Production and the China Production at the time the agreements were reached, but when DRE announced those productions were available for pick-up the Defendants dragged their feet and delayed because they did not actually have Buyers contractually in place.

45. DRE was merely a pawn in the Defendants' game, wherein Defendants hoped that both DRE could be incentivized to produce a massive quantity of masks at its own expense and the Defendants could find Buyers for those masks at a profit. When Defendants could not find the promised Buyers, DRE was left footing the bill.

46. Defendants Berkley and Lyons repeatedly advised DRE's management, including Ahmed "Isaac" Bawany, by text, by phone, by WhatsApp messages, and even in person that payment would be forthcoming for both the PPE under the Boxed Production Contract and the China Production Contract.

47. Due to DRE's hard work and massive expenditure, it was able to build the facilities required to meet the demands of the Boxed Production Contract and informed the Defendants of that fact including that the first order of 500,000 boxes was ready to be picked up. Because of the massive quantity it was physically impossible to pick up all 6 million boxes at the same time. The production and pick up by necessity, and obviously, had to be rolling.

48. DRE also relayed that the China Production needed to be picked up in order to make more physical space for additional production.

49. Defendants at all times informed DRE that both contracts (the Boxed Production Contract (sometimes called the "production deal" or "US production deal" in correspondence) and the China Production Contract remained in place and that Defendants intended to honor them, repeatedly informing DRE that payment would be sent.

50. In fact, at one point in time on September 28, 2021, Berkley even sent DRE evidence of adequate funds in its Bank account of over $1.9 billion dollars so that DRE would rely on their ability to pay. (Exhibit I) Berkley later explained that this was simply a show of good faith that the funds would be sent any moment.

51. For example, on October 2, 2021 defendant Anthony Lyons messaged Bawany:

*Please bear with Max who is on top of this*

*Our deal is set and the money is due any minute*

*We are all agreed and set*

*Just needs everyone to stay calm and patient*

52. On November 29, 2021, after weeks of texts and messages, Defendant Lyon assured DRE: "Max / Stephen tell me the money is due today for these 5 mil packs of Chinese masks - unfortunately, thanksgiving last week was unavoidable - these things happen but it will close any minute."

53. On November 29, 2021, Defendant's employee Max Dobi texted Bawany: "we are moving money should be in and I will wire u tomorrow from the escrow account Sunny titles."

54. On November 29, 2021Anthony Lyons assured Bawany by text: Max & Stephen say funds coming thru today.

55. On December 3, 2021, Lyons messaged Bawany: "Max & Stephen say funds coming thru today."

56. After another week of texts and messages, on December 8, 2021, defendant Anthony Lyons assured DRE again payment was coming:

Hi there

I have been on the phone to Max for probably three or four hours today discussing various deals including yours

I do not want to have said she said situation so believe its best if you speak to him

The good news, is the 6 million packs will be closed tomorrow

57. On December 9, 2021, Lyons messaged Bawany again:

- "The 5 or 6 mil pack deal is due to pay TODAY or tomorrow - the deals all agreed after the inspection report was received this morning."

- max just said money is due today so we will all be relieved
- he [Max] and i are happy to let the inspector check the 500,000 tomorrow and pay for these and the 300,000 next Tuesday and at least gets these done ✅

58. On December 13, 2021, Lyons messaged Bawany again:

Anthony Lyons: I told you last week to get these 5 mil packs and the other 5 mil done ✅

And get the first 800k of your production deal collected and then we can speak from a position of happiness and peace

Agreed ?

59. On December 13, 2021, Berkley employee Matthew Ortolani messaged Bawany as follows:

[12/13/21, 1:58:26 PM] Matt Ortolani: Updates:

1. Chinese masks - should be sold and closed out today End of Business.

2. Donavin Heard inspection of the 500k - he was double booked this morning and they have to send a different inspector to the location to complete that inspection. Awaiting their details now

[12/13/21, 2:21:51 PM] A. Isaac Bawany: I need the information for inspection please asap

[12/13/21, 2:22:06 PM] Matt Ortolani: getting it any time now

[12/13/21, 3:43:31 PM] A. Isaac Bawany: ??

[12/13/21, 4:00:19 PM] A. Isaac Bawany: Please adjust

[12/13/21, 4:00:21 PM] A. Isaac Bawany: Advise*

[12/13/21, 4:04:17 PM] Matt Ortolani: I'm waiting on the inspectors information and eta to Buena Park

[12/13/21, 4:07:39 PM] A. Isaac Bawany: And how about the Chinese masks

[12/13/21, 4:13:02 PM] Matt Ortolani: Who is John LaFay and Jennifer Saltzman and George with VRC

[12/13/21, 4:28:30 PM] Matt Ortolani: Dan Shaugnessy with VRC

[12/13/21, 5:49:25 PM] A. Isaac Bawany: I don't know

[12/13/21, 9:11:19 PM] A. Isaac Bawany: Any updates ?

[12/14/21, 12:19:18 PM] A. Isaac Bawany: Any updates?

[12/14/21, 12:28:58 PM] Matt Ortolani: Just spoke to the Doctor who signs off on the purchases, Anthony spoke to them, they assured him the purchase is happening today for the 5M

They may want a certain quantity boxed, awaiting if they want it and how much boxed

[12/14/21, 12:29:19 PM] A. Isaac Bawany: Where's the inspector for the US production?

[12/15/21, 5:28:04 PM] A. Isaac Bawany: What's going on exactly?

[12/15/21, 5:56:22 PM] Matt Ortolani: I think max just forwarded it

[12/15/21, 5:56:41 PM] Matt Ortolani: Update from Buyer Back Office:

- Judy heads the back office operations
- Judy is in charge of wiring from their company
- They are finalizing paperwork for the wire transfer
- Dr. Pennington at the hospital is on east coast time zone

- Judy is west coast time zone

- It is in the final stretch and just final sign offs are happening now.

[12/16/21, 2:02:46 PM] A. Isaac Bawany: Any update?

[12/16/21, 2:15:56 PM] Matt Ortolani: Spoke at 11am EST

Assured that they will take all 5 million packs of masks in poly bags, no boxing needed.

They will also take more boxes of US made masks after the 5M packages are transacted upon.

Assured wire is imminent. Nothing is holding up the deal other than their internal transaction process.

60. During this entire time period DRE incurred massive storage fees, equipment costs, payroll costs, consultant costs, and borrowing costs, in an effort to honor the terms of its agreements with Defendants.

61. Similarly, DRE continued spending on labor and machinery to improve the manufacturing process so that it could meet the production requirements of the SPA deal.

62. On December 23, 2021, Isaac Bawany on behalf of DRE flew to meet with Defendants Berkley and Lyons while Lyons was vacationing in Colorado and Lyons specifically promised at the meeting on the December 24, 2021 that payment would be forthcoming that same day. In fact, Mr. Lyons even set up a call with the supposed end Buyer who informed Mr. Bawany that the wire was being processed that day.

63. During the in person meeting Mr. Bawany expressed skepticism about the supposed end Buyers on the phone call and Mr. Lyons assured Mr. Bawany that funds would be received no later than January 2, 2022. Payment never came.

64. During this time Mr. Bawany continued to suffer substantial damages as a result of Defendants' breach and his reliance on their promises. In particular, two different lenders filed suit against DRE and Mr. Bawany during December because he was unable to repay loans that were taken out in reliance on Defendants' promises and contractual obligations.

**COUNT I – Actions for Account Stated**

65. DRE incorporates the averments made and contained in paragraphs 1 through 64 above as if the same were fully stated herein.

66. DRE and Defendants had prior financial dealings.

67. DRE and Defendants had various open accounts, including open accounts related to the Boxed Production Contract as well as the China Production.

68. For the dealings associated with the Boxed Production Contract, including the dealings associated the building of manufacturing and warehousing facilities by DRE and the sale of PPE to Defendants, DRE submitted uncontested invoices to Defendants reflecting owed accounts in Invoice No. 279722 of September 10, 2021.

69. Defendants received DRE's Invoice No 279722, with such invoice reflecting a demand for payment owed on accounts totaling $184,800,000. *See* Exhibit E.

70. The accounts stated as owed in Invoice No 279722 were not contingent on any future event, occurrence, or action.

71. Defendants acknowledged the propriety of the account stated on Invoice No 279722 on multiple occasions.

72. Defendants repeatedly stated their unconditional intention to pay DRE all accounts stated on Invoice No 279722.

73. DRE's Invoice No 279722 reflects the amount owed by Defendants related to the Boxed Production Center under the instruments and arrangements previously agreed between the parties.

74. The parties' course of dealings led also to the sale of the China Production.

75. Flowing from these prior dealings, DRE submitted a second uncontested Invoice to Defendants reflecting owed accounts on September 10, 2021, in Invoice No 279723. *See* Exhibit H.

76. The accounts stated as owed in Invoice No 279723 were not contingent on any future event, occurrence, or action.

77. Defendants received DRE's Invoice No 279723, with such invoice reflecting a demand for payment owed on accounts totaling $11,000,000.

78. Defendants acknowledged the propriety of the account stated on Invoice No 279723 on multiple occasions.

79. Defendants repeatedly stated their unconditional intention to pay DRE all accounts stated on Invoice No 279723.

80. DRE's Invoice No 279723 reflects the amount owed by Defendants related to the China Production under the instruments and arrangements previously agreed between the parties

81. Defendants have repeatedly acknowledged the propriety of the accounts stated in DRE's invoices and have likewise repeatedly stated their unconditional intention to pay the same.

82. At all times, the charges reflected in DRE's Invoices were reasonable.

83. Defendants are therefore foreclosed from contesting the transactions reflected in the accounts stated in DRE's Invoices. *Chisler v. Staats*, 502 S.W. 2d 424, 427 (Mo. App. 1973).

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley and Lyons for $195,000,000.00, as well as all lawful interest, together with DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT II – BREACH OF CONTRACT – Boxed Production Contract**

84. DRE incorporates the averments made and contained in paragraphs 1 through 83 above as if the same were set forth herein.

85. Berkley entered into a contract with DRE whereby DRE agreed to sell large quantities of PPE equipment based on the terms set forth in attached exhibits A through E in exchange for Berkley's promise to pay for the same.

86. DRE made it clear to Berkley that it would require some time and investment to build up the proper manufacturing facility. .

87. On September 15, 2021, DRE sent the Boxed Production Contract which included terms and conditions and a delivery schedule.

88. By October of 2021, DRE was ready to fully perform its responsibilities and provide the PPE product required under the Boxed Production Contract and on November 1, 2021 DRE unambiguously informed Berkley of such through counsel's letter.

89. Pursuant to the terms of the Boxed Production Contract and DRE's terms and conditions, payment was due immediately upon receipt of DRE's November 1, 2021 letter. But Berkley breached the contract by failing to pay for and pick up the PPE product.

90. DRE relied on the promises of Berkley that it had a stable of ready and willing buyers for the medical masks who desperately wanted to purchase the masks.

91. DRE focused on the Berkley contracts in lieu of pursuing other significant ventures in order to honor DRE's obligations under the agreement with Berkley.

92. Based on its agreement with Berkley, DRE understood the Berkley contracts would be a reliable and steady source of profitable revenue for DRE..

93. Berkley breached its contract with DRE by failing to pay the required amounts pursuant to the parties' agreement and by failing to fulfill Berkley's obligations pursuant to the parties' agreement.

94. In addition, as Berkley knew when it entered into the Boxed Production Contract that DRE borrowed and spent millions of dollars building a production facility to meet the massive quantity requirements of the contract.

95. Due to Berkley's breaches of the agreement, DRE has sustained and continues to sustain substantial damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley for $195,000,000.00, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT III – PROMISSORY ESTOPPEL**
**(in the Alternative to Count I – Breach of Contract)**

96. DRE incorporates the averments made and contained in paragraphs 1 through 83 above as if the same were fully stated herein.

97. Berkley made a promise to DRE that Berkley would pay for the millions of boxes of masks set forth in the Boxed Production Contract.

98. DRE foreseeably relied on Berkley's promise, and as part of such foreseeable reliance, DRE focused its efforts on the significant Berkley contracts and invested in labor, materials, equipment, consultants, and storage based on the expectation Berkley would honor its promise.

99. DRE reasonably relied on Defendants' continued reassurances that Berkley would pay for and pick up the PPE.

100. Defendants breached its promise by failing to pay for the products to be supplied by DRE and Berkley further failed to comply with the terms and conditions applicable to such promise.

101. DRE would suffer substantial injustice absent the enforcement of the promises made by Defendants, in that DRE's focused and invested on the Berkley contracts to its detriment in reliance on the promises of Defendants.

102. In addition to direct monetary losses DRE sustained by Berkley's failure to honor its promise, DRE also sustained additional damages to its reputation within the industry as a trusted supplier of PPE supplies.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable

**COUNT IV – SPECIFIC PERFORMANCE-Boxed Production Contract**
**(in the Alternative to Count I – Breach of Contract)**

103. DRE incorporates the averments made and contained in paragraphs 1 through 83 above as if the same were fully stated herein.

104. DRE and Berkley entered into the aforementioned SPA and Boxed Production Contract, which together with the DRE terms and conditions and new customer application, set forth the terms of the parties' agreement..

105. The parties' agreement is complete in its essential and material terms.

106. The parties' agreement is capable of being enforced without adding to its terms.

107. DRE performed and/or stood ready to perform its obligations pursuant to the parties' agreement.

108. Berkley breached the parties' agreement by failing to pay the required funds, refusing to pay amounts admittedly due and owing to DRE unless DRE agreed to changes the terms of the parties' agreement, and by failing to fulfill Berkley's obligations pursuant to the parties' agreement.

109. Due to Berkley's breach of the parties' agreement, DRE has sustained and continues to sustain substantial damages.

110. DRE is entitled to the specific performance of the parties' agreement in that the parties' agreement may preclude the recovery of certain damages thereby leaving DRE without a fully adequate remedy at law to recover its substantial losses due to Berkley's failure to perform its obligations pursuant to the parties' agreement.

111. DRE is also entitled to specific performance of the parties' agreement with Berkley in that the facts existing at the time Berkley was to perform its obligations under the parties' agreement *(i.e.* the existence of an ongoing global pandemic and heightened need for DRE to supply customers with PPE), Berkley's failure to perform its contractual obligations caused DRE to sustain additional damages, both to its reputation in the marketplace as a supplier of critical health supplies such as PPE, as well as DRE's lost opportunities to provide PPE to entities with heightened needs for PPE, all of which cannot be adequately compensated by monetary damages alone.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against for specific performance of its agreements outlined above, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT V – BREACH OF CONTRACT—China Production – Defendant Berkley**

112. DRE incorporates the averments made and contained in the above paragraphs 1 through 111 above as if the same were fully stated herein.

113. Though not called for by the SPA Agreement, DRE first raised with Berkley the notion of selling them the China Production, and made them an offer regarding same.

114. Berkley accepted the offer via text message, agreeing to purchase the China Production for $11 Million with certain amounts offset as agreed to by the Parties.

115. DRE sent Berkley an Invoice no. 279723, dated September 10, 2021, (the "China Production Contract"), which related to the PPE being sold to Berkley which were coming from China and among other things, stated in clear terms that payment was due in full upon cargo customs clearance in the USA.

116. DRE provided Berkley valuable consideration by holding the China Production for it and giving it exclusive rights to those masks.

117. In reliance on Berkley's agreement to purchase the China Production, DRE held that Production for Berkley at its detriment, including that the five millions masks takes up an inordinate amount of space in DRE's factory, precluding it from manufacturing additional masks that it could have sold to other buyers. DRE also was precluded from selling those masks elsewhere at a time when the value of masks was sky high.

118. As a result of Berkley's break of the China Production Contract, DRE was damaged.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Berkley for an amount in excess of $11,000,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT VI – NEGLIGENT MISREPRESENTATION—All Defendants**

119. DRE incorporates the averments made and contained in paragraphs 1 through 118 above as if the same were fully stated herein.

120. The Defendants made repeated representations to DRE that they intended to honor the Boxed Production Contract and the China Production Contract. Defendants continued informing DRE that they had buyers lined up and that DRE should continue working toward meeting the production requirements each contract.

121. At no point in time did the Defendants inform DRE that it viewed the Boxed Production Contract as terminated or no longer binding.

122. The promises made by the Defendants were made to induce DRE to continue working toward compliance with the significant production requirements of the Boxed Production Contract. DRE acted in reliance on same.

123. In reality, the representations were false, as Defendants have yet to make payments under the terms of the Boxed Production Contract.

124. In addition, Defendants repeatedly represented to DRE that they intended to follow through on the China Production Contract.

125. Relying on these representations, DRE held the millions of masks in the China Production for Berkley's exclusive use, turning down offers to sell the masks elsewhere and holding the masks at its facilities taking up valuable space that could have been used for different product several times over.

126. During this time, masks were extremely valuable, with the Omicron variant of Covid-19 running rampant.

127. The representations that Defendants made regarding the China Production similarly were false, as payment was repeatedly promised and never received.

128. The statements, promises and representations made by Defendants, as aforementioned, were a misrepresentation of the truth designed to induce Plaintiff's agreement to the Addendum and designed to buy time so Defendants could try to find buyers that they falsely claimed they already had in place.

129. Defendants should have known at the time of conveying these promises, assurances and representations that they were false and would not be kept or honored.

130. Defendants' misrepresentations were material, and they convinced Plaintiff to incur substantial costs as it borrowed and geared up and staffed up to meet the obligations of DRE under the Boxed Production Contract.

131. Defendants' misrepresentations were, in fact, false, and were not substantially fulfilled, were not honored or complied with as Defendants never substantially performed or completed their above-referenced promises, agreements and assurances as Defendants did not provide the funds as promised, agreed and assured.

132. Plaintiff relied upon the truth and honesty of Defendants' representations, and Plaintiff had the right to such reliance in that Defendants had superior knowledge of the facts in question, and such representations caused Plaintiff to undertake the detrimental actions aforementioned.

133. As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has sustained and incurred direct and proximate harm and damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

**COUNT VII – FRAUDULENT INDUCEMENT—All Defendants**

134. DRE incorporates the averments made and contained in the above paragraphs 1 through 133 above as if the same were fully stated herein.

135. The Defendants made repeated representations to DRE that they intended to honor the Boxed Purchase Agreement regardless of any issues with the delivery schedule. Defendants continued informing DRE that they had buyers lined up and that DRE should continue working toward meeting the production requirements of the Boxed Production Contract.

136. At no point in time did the Defendants inform DRE that it viewed the contracts as terminated or no longer binding.

137. The promises made by the Defendants were made to induce DRE to continue working toward compliance with the Boxed Production Contract. DRE acted in reliance on same.

138. In reality, the representations were false, as Defendants have yet to make payments under the terms of the Boxed Production Contract.

139. In addition, from September 10, 2021 up to just weeks before the filing of this Complaint, Defendants repeatedly represented to DRE that they intended to follow through on the China Production Contract, but no payment or even partial payment has been delivered.

140. Relying on these representations, DRE held the millions of masks in the China Production for Berkley's exclusive use, turning down offers to sell the masks elsewhere and taking up valuable space in DRE's facility.

141. During this time period masks were extremely valuable, with the Omicron variant of Covid-19 running rampant.

142. The representations that Defendants made regarding the China Production similarly were false, as payment was repeatedly promised and never received.

143. The statements, promises and representations made by Defendants, as aforementioned, were a misrepresentations of the truth designed to induce Plaintiff's agreement to the Addendum and designed to buy time so Defendants could try to find buyers that they claimed they already had in place.

144. Defendants knew or should have known at the time of conveying these promises, assurances and representations that they were false and would not be kept or honored.

145. Defendants' misrepresentations were material, and they convinced Plaintiff to incur substantial costs as it borrowed and geared up and staffed up to meet the obligations of DRE under the Boxed Production Contract.

146. Defendants' misrepresentations were, in fact, false, and were not substantially fulfilled, were not honored or complied with as Defendants never substantially performed or completed their above-referenced promises, agreements and assurances as Defendants did not provide the funds as promised, agreed and assured.

147. Throughout the process, DRE was transparent with Defendants that it was relying on Defendants' representations and was taking substantial financial steps in reliance on same. Defendants' intentionally made the statements in an effort to induce DRE to continue spending money performing under both the Boxed Production Contract and the China Production Contract as they searched for Buyers that they claimed existed but that never materialized.

148. The inducements were intentionally made in an effort to buy time as Defendants realized that Berkley was in substantial breach of the Boxed Production Contract and would owe massive damages to DRE if Defendants were unable to find Buyers as contemplated and promised.

149. Plaintiff relied upon the truth and honesty of Defendants' representations, and Plaintiff had the right to such reliance in that Defendants had superior knowledge of the facts in question, and such representations caused Plaintiff to undertake the detrimental actions aforementioned.

150. As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has sustained and incurred direct and proximate harm and damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

## COUNT VIII – FRAUDULENT MISREPRESENTATION

151. DRE incorporates the averments made and contained in paragraphs 1 through 150 above as if the same were fully stated herein.

152. The statements, promises and representations made by Defendants, as aforementioned, were fraudulent misrepresentations of the truth designed to induce Plaintiff's agreement to the Addendum.

153. Defendants repeatedly misrepresented to Plaintiff:

a. that Defendants would be ready to buy and pick up the PPE under the Boxed Production Contract on a weekly basis and they had customers locked down.

b. that payment was imminent and would be forthcoming.

154. Defendants knew at the time of conveying these promises, assurances and representations that they were false and would not be kept or honored.

155. Defendants' misrepresentations were material, and they convinced Plaintiff to incur substantial costs to meet the obligations of DRE under Boxed Production Contract.

156. Defendants' misrepresentations were, in fact, false, and were not substantial fulfilled, were not honored or complied with as Defendants never substantially performed or completed their above-referenced promises, agreements and assurances as Defendants did not provide the funds as promised, agreed and assured.

157. Defendants' intention at the time of making these misrepresentations was for the purpose of inducing and enticing Plaintiff into agreeing to the Addendum for Defendants' benefit and was designed to allow Defendants to obtain economic benefit and financial gain.

158. Plaintiff was unaware of any information or knowledge which would have indicated or revealed the falsity of Defendants' representations, omissions and promises.

159. Plaintiff relied upon the truth and honesty of Defendants' representations, and Plaintiff had the right to such reliance in that Defendants had superior knowledge of the facts in question, and such representations caused Plaintiff to undertake the detrimental actions aforementioned.

160. As a result of Plaintiff's reasonable reliance on Defendants' misrepresentations, Plaintiff has sustained and incurred direct and proximate harm and damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants for an amount in excess of $75,000, for DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

## COUNT IX – CIVIL CONSPIRACY

161. DRE incorporates the averments made and contained in paragraphs 1 through 160 above as if the same were fully stated herein.

162. Defendants conspired together to defraud Plaintiff.

163. There was a meeting of minds on the course of the aforementioned actions to be accomplished by the co-conspirators.

164. The Defendants as co-conspirators committed one or more acts in furtherance of the conspiracy, including the causing or inducing a breach of contract or business expectancy of Plaintiff, and/or to injure or destroy the trade and business of Plaintiff.

165. As a result of the tortious acts by one or more Defendants as co-conspirators, which occurred in pursuance of the conspiracy, Plaintiff sustained substantial damages.

WHEREFORE, based on the above and foregoing, DRE prays the Court grant judgment against Defendants in an amount exceeding $75,000, as well as DRE's costs and reasonable attorney's fees, and for any and all relief the Court deems just and equitable.

Dated January 18, 2022.

Respectfully submitted,

**JAMES SOBBA, LLC**

/s/ *G. Edgar James*
G. EDGAR JAMES MO# 49585
LAWRENCE E. NORDLING MO# 62319
4435 Main Street, Suite 910
Kansas City, Missouri 64111
Telephone: (816) 623-0043
ejames@jamessobba.com
lnordling@jamessobba.com

**ATTORNEYS FOR PLAINTIFF**
**DRE HEALTH CORPORATION**

**And**

**JONES DAY**
Adam W. Wiers, Esq. – Will Admit Pro Hac Vice
77 West Wacker Drive
Suite 3500
Chicago, IL 60601
**ATTORNEYS FOR PLAINTIFF**
**DRE HEALTH CORPORATION**

JS 44 (Rev 09/10)

# UNITED STATES DISTRICT COURT
# WESTERN DISTRICT OF MISSOURI

## CIVIL COVER SHEET

This automated JS-44 conforms generally to the manual JS-44 approved by the Judicial Conference of the United States in September 1974. The data is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. The information contained herein neither replaces nor supplements the filing and service of pleadings or other papers as required by law. This form is authorized for use only in the Western District of Missouri.

**The completed cover sheet must be saved as a pdf document and filed as an attachment to the Complaint or Notice of Removal.**

**Plaintiff(s):**
First Listed Plaintiff:
DRE Health Corporation ;
1 Citizen of This State;
**County of Residence:** Jackson County

**Defendant(s):**
First Listed Defendant:
Berkley Equity Limited ;
3 Citizen of Foreign Country;
**County of Residence:** Outside This District

Additional Defendants(s):
Anthony Lyons ;
2 Citizen of Another State; Colorado

**County Where Claim For Relief Arose:** Jackson County

**Plaintiff's Attorney(s):**
G. Edgar JAMES ( DRE Health Corporation)

4435 Main Street, Suite 910
KANSAS CITY, Missouri 64111
**Phone:** 8166230544
**Fax:**
**Email:** ejames@jamessobba.com

**Defendant's Attorney(s):**

**Basis of Jurisdiction:** 4. Diversity of Citizenship

**Citizenship of Principal Parties** (Diversity Cases Only)

**Plaintiff:** 1 Citizen of This State

**Defendant:** 3 Citizen of Foreign Country

**Origin:** 1. Original Proceeding

**Nature of Suit:** 190 All Other Contract Actions
**Cause of Action:** Title 28 U.S.C. Section 1332
**Requested in Complaint**

**Class Action:** Not filed as a Class Action

**Monetary Demand (in Thousands):** 195000000

**Jury Demand:** Yes

**Related Cases:** Is NOT a refiling of a previously dismissed action

---

**Signature:** G. Edgar James

**Date:** 1/18/2022

If any of this information is incorrect, please close this window and go back to the Civil Cover Sheet Input form to make the correction and generate the updated JS44. Once corrected, print this form, sign and date it, and submit it with your new civil action.

DRE +Health

## New Customer Application

### ▶ Section A – Company Information

Date: 09/02/2021

Account Number: ______

*Complete Business Name and Address (Shipping Information)*

Name Berkley Equity Ltd
Address PO Box 73, Lyford Cay N776
City Nassau
State Bahamas Zip ______
Telephone # 30559027525
Fax # ______
Email: al@matcap.co

*Business Legal Name and Address (Billing Information)*

Name Berkley Equity Ltd
Address PO Box 73, Lyford Cay N776
City Nassau
State Bahamas Zip ______
Telephone # 30559027525
Fax # ______
Email: al@matcap.co

**Type of Business:** ☒ Corporation ☐ Partnership ☐ Sole Proprietor* (Social Security # is required) ☐ Other

Principal Owner(s) Anthony Lyons
*Social Security Number(s) ______
Nature of Business Wholesale
Years in Business 20
Name of Contact Person: Anthony Lyons
Contact Phone # 30559027525
DEA# ______

**▶ Attach copy of DEA license, Tax Exemption Certificate, and/or a copy of a W-9 or Business License.**

Tax Exempt: Yes X No____ **If you are exempt from paying sales tax in your State, please supply a copy of your State sales tax exemption certificate with your completed application. Manufacturers need to incorporate the items they purchase from DRE Health into the product they produce in order to be considered exempt for those items.

The Applicant warrants the information supplied above to be true, and agrees that information set forth on this form may be shared with affiliates of DRE Health Corporation ("DRE"), including other members of the DRE Corporation family of companies. The Applicant authorizes DRE Health Corporation, to investigate the references herein, statements or other data obtained from Applicant or from any other person pertaining to the Applicant's credit and financial responsibility. The Applicant agrees to abide by the Standard Terms of Sale published regularly by DRE, as shown on DRE's invoices, or by any other terms of sale upon which DRE and the Applicant should agree in writing. The Applicant agrees to pay interest on past due accounts at the highest rate permitted by law, together with attorneys' fees and all other costs and expenses incurred by DRE in collecting such accounts. The Applicant agrees that all payments to which DRE is entitled shall be paid to DRE at its offices in Kansas City, Missouri. The Applicant agrees that the laws of Missouri shall govern all transactions between DRE and the Applicant, that exclusive venue and jurisdiction of any dispute or suit arising between DRE and the Applicant shall be within the courts of the State of Missouri, and the Applicant hereby consents to the jurisdiction of the Missouri courts in any such dispute or suit. NOTICE: The federal Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The federal agency that administers compliance with this law concerning this credit is the Federal Trade Commission, Division of Credit Practices, 6th and Pennsylvania Avenue, NW, Washington, D.C. 20580.

***You must sign this form below.***

Each of the undersigned individuals authorizes DRE Health Corporation to make inquiries with any credit reporting agency, bank or trade reference in connection with the extension or credit contemplated hereby.

Principal, Owner, or Authorized Agent Anthony Lyons Title Chairman Date 9/2/2021

Signature: [signature]

Signature: ______

**▶ Complete this form and email to: info@drehealth.com**

DRE Health Corporation | Kansas City, MO 66624

©2018 DRE Health Corporation Not responsible for typographical errors.



EXHIBIT A

# DRE New Client Onboarding Berkley

Final Audit Report 2021-09-02

| | |
|---|---|
| Created: | 2021-09-02 |
| By: | Matt Ortolani (matt.ortolani@gmail.com) |
| Status: | Signed |
| Transaction ID: | CBJCHBCAABAAM8SdXf0sbm6cTWiNfQ08AFAwbm4JTYoi |

## "DRE New Client Onboarding Berkley" History

Document created by Matt Ortolani (matt.ortolani@gmail.com)
2021-09-02 - 6:37:52 PM GMT- IP address: 45.146.55.171

Document emailed to Anthony Lyons (al@matcap.co) for signature
2021-09-02 - 6:38:06 PM GMT

Email viewed by Anthony Lyons (al@matcap.co)
2021-09-02 - 6:59:17 PM GMT- IP address: 217.138.14.50

Document e-signed by Anthony Lyons (al@matcap.co)
Signature Date: 2021-09-02 - 7:02:19 PM GMT - Time Source: server- IP address: 217.138.14.50

Agreement completed.
2021-09-02 - 7:02:19 PM GMT

Adobe Sign



EXHIBIT A

DRE +lealth

**General Terms and Conditions of Sale, Delivery and Payment of DRE Health Corporation established in Missouri/Kansas and of its associated companies.**

Article 1 - definitions

1.1 These General Terms and Conditions shall apply to and be incorporated into all offers by and agreements relating to the delivery of goods by or between DRE Health or any of its legal successors or companies affiliated with or owned by DRE Health or with said successors (hereinafter: the Company), and the customer or client (hereinafter: the Customer) with whom the Company contracts through any offer, purchase order or agreement.

1.2 The applicability of the Customer's general terms and conditions is hereby explicitly rejected.

1.3 Any stipulations deviating from these General Terms and Conditions shall only apply in the event that and insofar as they have been accepted by the Company in writing.

Article 2 - offer

Any offer made by the Company shall be without prejudice to the Company or a waiver if its rights under applicable law and subject to contract; this shall also apply in the event that said offer includes a period for acceptance, unless explicitly provided for to the contrary in writing.

Article 3 - agreement

3.1 An agreement, in this article also including any changes and/or additions thereto, shall not be binding until agreed upon in writing, except in the event that the Company has started the execution of the contract beforehand.

DRE +lealth

or of the Company's invoice. Promises made by and arrangements with subordinates or agents of the Company shall not bind the Company unless these have been confirmed by the Chief Executive Officer or board of management of the Company in writing.

3.3 The contract represents the contents of the agreement completely and correctly. The order confirmation by the Company or the Company's invoice shall be considered to represent the contents of the agreement correctly unless the Customer protests against its contents forthwith in writing.

3.4 Slight deviations with customary tolerances shall be permitted at the execution of the agreement.

3.5 Unilateral cancellation from the side of the Customer shall be null and void, unless the Company agrees to such cancellation in writing.

Article 4 - notices, information and statements

Notices, information, statements and samples made or supplied by the Company, in whatever form or nature, shall only be indicative and shall never bind the Company, unless the agreement explicitly provides for the contrary.

Article 5 - confidentiality

The Customer shall observe confidentiality towards any third party in the broadest sense of the word regarding any and all business information relating to the Company, which has been brought or come to his knowledge by the Company and/or within the framework of the offer or the agreement.

Article 6 - prices

6.1 The prices stated and/or agreed upon by the Company shall be exclusive of taxes - including Value Added Tax ("B.T.W.") - and levies, and shall be based on the Terms and Conditions (of delivery) as mentioned in the following articles.

DRE Health

6.3 Insofar as the stated and/or agreed prices are based on the weight of the goods, this weight shall be determined by the weighing carried out by the Company before the delivery, using calibrated weighing apparatus. The Customer shall have the right to be present at said weighing, provided the delivery shall not be delayed because of this. The Customer shall take the initiative thereto himself in good time.

6.4 The Company shall have the right to increase the stated and/or agreed prices in the event of an increase in prices of goods, raw materials or parts to be obtained from third parties, wages, national insurance contributions, freight, insurance premiums or other cost price factors (including changes in foreign exchange) and charges (including import and transit duties).

In the event that a price increase takes place within three months after the conclusion of the agreement, the Customer who is also a consumer shall be entitled to dissolve the agreement.

6.5 In the event that the state d and/or agreed prices are (also) based on restitutions of levies and/or on subsidies, whereas these are not obtained for whatever reason, the Company is entitled to adjust the prices accordingly.

Article 7 - delivery – delivery period – delivery time

7 .1 Unless explicitly agreed upon otherwise, the delivery shall be made "Ex Works" (EXW) from the premises of the Company. The interpretation of the terms and conditions of deli very shall be determined by the most recent edition at the time of conclusion of the agreement of the Incoterms, as issued by the International Chamber of Commerce.

7.2 The delivery period shall commence at the latest on:

- the date of conclusion of the agreement;

- the date at which the Company has at its disposal all the documents, information, permits, exemptions, approvals, allocations, etc., needed for the delivery of the goods;

DRE Health

conclusion of the agreement and on the timely delivery of the materials and goods ordered by the Company for the execution of the agreement. In the event that any delay arises as a result of changes in these circumstances or because the materials and/or goods timely ordered for the execution of the agreement have not been delivered in time, the delivery period shall be extended to such a degree as is reasonable , taking all circumstances into consideration.

7.4 The delivery date of the goods shall be the moment in time when the goods, with the exception of unimportant parts, are ready for shipment, and the Company has informed the Customer thereof, or the time when the goods have left the premises of the Company to be forwarded to the Customer.

7.5 The Company shall be entitled at all times to make partial deliveries, unless explicitly agreed upon otherwise.

7.6 The delivery date shall not be considered to be a firm date, unless explicitly agreed upon otherwise. In the event of attributable exceeding of the delivery date, a notice of default shall always be required. The Customer cannot derive any rights from attributable exceeding of the delivery date insofar as a term of three (3) months is not exceeded. Customer recognizes that revisions in the schedule are inherent in the nature of the supply of Company's goods which may result in revisions in the schedule or delivery of goods. Customer agrees that Company cannot guarantee any delivery date for goods and Company shall bear no financial responsibility for delays that arise through circumstances beyond its sole control, including but not limited to delays due to abnormal weather conditions, material shortage, labor disruption, shipping disruptions, pandemic, war or other reasons beyond the Company's sole control.

7.7 In the event that the Company is in default with regard to the schedule of deliveries or the delivery date, the Customer's sole remedy shall be to dissolve the agreement and pay Company for its costs incurred or good supplied. In that case, any remaining prepaid amounts shall be refunded, without any compensation for interest, however.

Article 8 - transportation

DRE Health

8.2 The Company shall not be responsible for (the use by the Customer of) any documents (provided by the Company) for the transportation of the goods to the place of destination.

8.3 At the first request of the Company, the Customer shall provide all necessary securities for the documents needed to transport the goods to the place of destination.

8.4 In the event that circumstances beyond the control of the Company prevent the goods from being transported to or onto respectively delivered at the agreed place, or in the event that the Customer fails to take delivery of the goods, the Company shall have the right - at its option - either to take the products back or to store the goods (or have them stored) at the expense and risk of the Customer. Any costs of return shipment and storage shall be payable by the Customer, while the Customer shall furthermore be obliged to fulfil his obligations to the Company as if delivery had taken place. The costs referred to here shall be determined in advance by the Company and the Customer jointly at 15 per cent at least of the agreed price, without prejudice to the right of the Company to compensation of the actual costs should these be higher.

Article 9 - packaging

9.1 Packaging for single use shall not be taken back by the Company.

The Company shall have the right - at its option - to take back or not take back packaging for repeated use.

9.2 The Company shall have the right to charge the Customer for packaging for repeated use as a separate item on the invoice, together with the delivered goods.

9.3 In cases referred to under paragraph 2 of this article, the Company shall send a credit invoice crediting the invoiced amount to the Customer for pack aging returned to the Company at the Customer's expense upon receiving said packaging, unless the returned packaging is in a condition inferior to the one at the time of acceptance by the Customer, in which case the amount credited shall be reduced accordingly.

DRE +lealth

9.5 Damage to goods caused by destruction/damage of the pack aging shall at all times be at the Customer's risk.

Article 10 - risk and transfer of property

10.1 The Customer shall bear the risk of any and all direct and indirect damage that may be caused to the goods, immediately after the goods are considered as delivered.

10.2 The Company shall retain ownership of all delivered goods until any debts payable by the Customer with regard to goods delivered or to be delivered by the Company to the Customer under any agreement, as well as with regard to any failure in the performance of such agreements by the Customer, shall be fully satisfied.

10.3 The Customer is obliged to store the goods delivered under retention of title with the necessary care, and to store them as identifiable property of the Company. The Customer shall furthermore be obliged to insure the goods against damage or loss, by whatever reason, during the period of retention of title. Said insurance shall designate the Company as (co - )insured with an independent right of claim towards insurer(s), and the Customer shall make the policies of these insurances available for inspection to the Company upon request. Upon request of the Company, all claims of the Customer on the insurers pursuant to the insurances referred to above shall be assigned to the Company, or a right of pledge shall be granted to the Company.

10.4 The Company shall be entitled to repossess any goods delivered under retention of title that are still present a t the Customer's forthwith and without prior notice of default, in the event that the Customer fails in the performance of his obligations. The Customer irrevocably authorizes the Company to exercise this right to repossess insofar as is necessary.

10. 5 In the event that and insofar as the Company has exercised its right to repossess as referred in the preceding para graph, the agreement shall be dissolved wholly or for a proportionate part without any judicial intervention, without prejudice to the right of the Company to compensation of damage and costs. The Customer shall then be

DRE Health

framework of his business operations, to sell and deliver the goods delivered to him under retention of title to third parties. In the event of such sales, the debt payable by the Customer to the Company regarding the goods resold by the Customer shall become forth with and fully due and payable, insofar as said claim was not already due and payable.

10.7 The Customer shall always be obliged to inform third parties of the Company's retention of title. Furthermore, the Customer shall be obliged to inform the Company of the whereabouts of the goods and of the person or company said goods have possibly been sold to, if so required by the Company.

Article 11 - payment

11.1 Unless explicitly agreed upon otherwise in writing, payment of the agreed price shall be made at the time of formation of the agreement.

11.2 Any and all payments shall be made without deduction or settlement, effectively in the currency as stated on the invoice.

In the event that the Customer alleges to have a claim on the Company with regard to the performance of the agreement, he will not be discharged from his obligation to pay in the manner agreed.

11.3 In the event that the Company has a well - founded fear that the Customer will not fulfil his obligations, the Company shall at its discretion be entitled to require sufficient security from the Customer with regard to the fulfilment of the obligations to pay, before performing or continuing to do so.

The Company shall be entitled to suspend the fulfilment of its obligations until the Customer has given said security.

11.4 In the event that the Customer has not paid at the time or within the period of time referred to in paragraph 1 of this article , he shall be in default by operation of law and without any prior notice of default being required, and he shall owe the statutory interest on the amount due and payable from the date at which the payment should

DRE Health

fulfilment, overdue or non - sufficient fulfilment of his obligations by the Customer, including extrajudicial collection costs and costs of legal assistance, shall be compensated by the Customer to the Company. The Company and the Customer jointly shall deter mine the extrajudicial collection costs in advance at 15 percent of the principal sum due, without prejudice to the right of the Company to compensation of the actual costs should these be higher.

Article 12 - return shipments

It shall not be permitted to return any goods delivered by the Company without the Company's prior written con sent. Should any return shipments take place, then this shall at all times be done at the expense and risk of the sender.

Article 13 - samples

The Customer shall be entitled to ask the Company to put (a) sample(s) of the goods at his disposal before delivery. If the Customer refrains from doing so, he shall be considered to agree to the quality and condition of the goods beforehand.

Article 14 - complaints and guarantees

14.1 Complaints can only refer to quantity, weight or specification, as well as to non - conformity of the delivered goods with the sample(s) made available by the Company.

14.2 The Customer shall check forthwith the goods ultimately on arrival.

14.3 Any complaints with regard to relevant defects observable at inspection of the goods, as well as complaints in connection with quantity, weight or specification shall be made in writing within 24 hours after the delivery, and include a complete description of the alleged defects, on default of which any claim in this respect shall become void.

14.4 Any complaints with regard to other relevant defects shall be made in writing within 24 hours after their disclosure, and include a complete description of the alleged defects, however ultimately within three ( 3) months after the delivery, on default of which any claim in this respect shall become void.

DRE +Health

b. the goods have been processed or the goods are otherwise not (or no longer) identifiable as originating from the Company;

c. the defects are (also) caused by normal wear and tear, inexpert and/or incorrect

treatment, use and/or storage or maintenance of the goods;

d. the Customer has not forthwith given the Company the opportunity to investigate the complaints and to fulfil its obligations;

e. the Customer has not, not in time or not sufficiently, fulfilled any obligation resting with him.

14.6 In connection with any parts and/or goods obtained from third parties which have not been treated by the Company, the Customer can only assert his claims against the Company insofar as the Company, in its turn, can assert any claims against its supplier. Should this be the case, the Company shall at any rate be discharged with respect to the Customer by transferring its rights with respect to its supplier to the Customer.

14.7 The Customer is not entitled to assert any rights against the Company in the event that he can also directly assert the rights with regard to the defects concerned against the manufacturer.

14.8 Without prejudice to the provisions in the previous paragraphs of this article, in the event of timely and justifiable com plaints, the Company shall only be obliged - at its option - to either repair the goods, proceed to redelivery or to credit the Customer for the defective goods. These General Terms and Conditions shall apply unimpaired to redelivery.

Article 15 - liability

15.1 The Company's liability under the agreement shall be limited to fulfilment of the obligations described in the agreement, in particular the obligations described in the previous article.





EXHIBIT B

DRE +lealth

liable for direct or indirect damage, including business damage, resulting from the infringement of any intellectual or industrial property rights, licenses or any other rights of third parties.

15.4 Should the Company be held liable by any third party/parties for any damage for which the Company is not liable pursuant to these General Terms and Conditions or otherwise, then the Customer shall be obliged to hold harmless and indemnify the Company against such damage and liability and to compensate it for any possibly ensuing costs, damage and interest.

15.4.1 Customer agrees to indemnify and hold Company harmless for, of and from, any loss or liability that Company may sustain by reason of Customer's breach of any purchase order or agreement or any breach of these terms or conditions or Customer's failure to comply with applicable laws, rules and regulations in connection any contract or purchase order with Company.

15.5 In no event shall the Company or its officers or employees be liable for any incidental, special, punitive or consequential damages of any kind, including without limitation loss of use, productivity, reputation, financing, business opportunities or profits. Moreover, to the fullest extent permitted by law, regardless of the theory of liability (including, without limitation breach of contract or warranty, negligence, errors or omissions, or strict liability), in no event will the Company's total aggregate liability related to any agreement or purchase order or its goods supplied or produced exceed the amount of compensation paid by Customer to the Company under any agreement or purchase order.

15.6 The limitations and exclusions of liability, as well as indemnity stipulated for the Company itself in the above paragraphs are also stipulated for and on behalf of its employees, any other person employed by it within the framework of the agreement, as well as for the persons from whom the Company obtains delivered goods and/or parts.

Article 16 - force majeure

DRE +lealth

revolt, strike, employees' lock - out, freight problems, fire, weather conditions preventing work and other interruptions of the Company's operations or of the operations of the Company's suppliers, as well as default of the Company's suppliers.

16.2 In the event of impediment to the performance of the agreement as a result of force majeure, the Company shall have the right without any judicial intervention, either to suspend the execution of the agreement for a maximum of four (4) months or to wholly or partially dissolve the performance or execution of the agreement, without the Company being obliged to pay any compensation.

Article 17 - (threatening) failure

In the cases provided for by the Law, as well as in the event that the Customer does not, not in time or not sufficiently, fulfil one or more obligations arising for him from the agreement, including the provisions in these General Terms and Conditions, or in the event that there is serious doubt as to the Customer being able to fulfil his contractual obligations towards the Company, as well as in the event of bankruptcy, suspension of payments, complete or partial stoppage of work, liquidation, trans fer or encumbrance of the Customer's business, including the transfer or pledging of an important part of his accounts receivable and furthermore in the event that any goods of the Customer are attached before judgement or in execution, the Company shall have the right, without notice of default or judicial intervention, either to suspend the performance or execution of the agreement for a maximum of three (3) months, or to partially or wholly dissolve the agreement, such without being liable to any compensation or guarantee, and without prejudice to any of its other rights.

Article 18 - suspension + dissolution - consequences

18.1 In the event of the Company's suspension of its obligations, it shall be authorized - and obliged at the end of the suspension period - to opt for execution or complete or partial dissolution of the agreement.

18.2 In the event of suspension or partial dissolution by virtue of the provision of the previous article, the agreed price shall be forthwith due and payable, after deduction





EXHIBIT B

payment of the amount due pursuant to the previous sentence, to take possession of the goods covered by that payment, failing which the Company shall have the right to have these goods stored at the risk and expense of the Customer, or to have them sold at his expense.

18.3 In the event that the Customer returns the goods received by him from the Company after dissolution of the agreement, said returning of the goods shall at all times be at the risk and expense of the Customer, until said goods have been taken possession of by the Company.

Article 19 - general

19.1 In the event that one or more stipulations of the agreement, including stipulations of these General Terms and Conditions, are null and void or become legally invalid, the remaining provisions of the agreement shall remain in force. Parties shall consult on the stipulations which are null and void or have become legally invalid, in order to make an alternative arrangement.

19.2 Should one or more stipulations of the agreement, including the stipulations of these General Terms and Conditions, be in conflict with mandatory provisions, stipulated by or to be stipulated by a there to competent authority, these latter provisions shall be considered to have replaced the relevant stipulations of the agreement.

Article 20 - disputes and applicable law

20.1 With regard to any and all disputes in connection with the agreement, or with regard to further agreements arising or resulting from or in connection with said agreement, the state or federal courts of Jackson county, state of Missouri, shall have exclusive jurisdiction in the first instance, unless the Company explicitly opts in writing for the competence of the court of the domicile or in the place of business of the Customer.

20.2 The agreement, as well as any and all further agreements arising or resulting from or in connection with said agreement, shall be governed by and construed in

DRE +lealth

CLIENT LOGIN TERMS & CONDITIONS OF SALE
TERMS & CONDITIONS OF PURCHASE

**DRE Health Corporation – Global**

Contact Us

About Us

Logistics Tracking

**DRE Market Insights**

Stay ahead by subscribing to our live global healthcare trade bulletin and gain valuable insight and market projection analytics on a weekly basis.

Email Address

SIGN UP

E-mail (General Inquiries): info@drehealth.com

Toll-Free: +1 (833) DRE-HEAL (373-4325)

#Choose DRE

**SALE & PURCHASE CONTRACT**
**PACKAGE STRUCTURE**

REF: [CCG2020I-001B]

Effective Date: September 2, 2021

This sale and purchase contract for the Product(s) as defined below (the "**Agreement**") is entered into as of the Effective Date above by and between the Seller and Buyer as defined below, each a "**Party**" and together the "**Parties**":

| | **"SELLER"** | **"SELLER AGENT"** | **"BUYER"** | **"PRODUCER"** |
|---|---|---|---|---|
| *Company Name* | Nativeaero Industries, LLC Distribution Rep - DRE Health Corp | DK Houck Enterprises LLC & | Berkley Equity Limited | Dre Health Corporation |
| *Registration Location & No.* | 84-5126981 Oklahoma, USA | Oklahoma City, OK | 1962344 British Virgin Islands | 001375092 Missouri, USA |
| *Address* | 1216 E. Kenosha St. Suite 190 Broken Arrow, OK. 74012. USA | 9620 South Pennsylvania Ave Suite A Oklahoma City, OK | P.O. Box 73 Lyford Cay, N7776 Nassau, Bahamas | 5700 W 112 Ste 300 Leawood, KS 66211-1747 |
| *Contact Name* | Lee Snider | Danny Houck | Anthony Lyons | Isaac Bawany |
| *Contact Title* | President | CEO &Director | Chairman | CEO |
| *Contact Tel* | +(1) 918-406-8789 | 405-415-9500 | +(1) 305-902-7525 | 833-373-4325 |
| *Contact Email* | lee@nativeaero-industries.com | danny@dkhouck.com | al@berkleyequity.com | |
| *Warehouse* | Kansas City, MO | Oklahoma City, OK | | |

**WHEREAS,** this Agreement is a document that is legally binding and enforceable under International Law and ICC Rules and Regulations including Non-Circumvention and Non-Disclosure.

**WHEREAS,** the Seller and Seller's Agent confirms its capabilities to fulfill the requirements of this Agreement and provide the Product herein mentioned and under the terms and conditions specified.

**WHEREAS** the Buyer with full corporate authority and responsibility hereby confirms that it is ready, willing, and able to purchase the Products under the terms and conditions of this Agreement.

**NOW THEREFORE,** for and in consideration of the foregoing and the mutual covenants and stipulations hereinafter set forth, the parties hereto have agreed, stipulated and covenanted and hereby agree, stipulate and covenant as follows:

1. **Product and Specification.** The Seller and Seller's Agent agrees to sell to the Buyer, and the Buyer agrees to buy from the Seller and the Seller's Agent, the Product, as defined below, on the terms and conditions set out in this Agreement. The Seller and Seller's Agent agrees that the product it will deliver to the Buyer will comply in all aspects with the following specifications (the "**Product**"):

| | |
|---|---|
| Product Description (See details in Annex A) | DRE Health Level 1 Surgical 3 ply masks (DRE DFM17) Dre Health Total defense 200 |
| Unit | 1 box (50 individual masks in a box) |
| Timing | The Seller and Seller's Agent warrants and represents that Seller and Seller's Agent shall make available the Product and Quantity as set out in this Agreement during the period commencing six (6) months from the date the Producer receives the Initial Deposit and for additional period of six (6) months, on substantially the same terms and conditions set forth herein, subject to the Parties entering into an additional Agreement. |
| Quantity | 5,000,000 (Five Million Blue) boxes of masks<br>and<br>1,000,000 (One Million Black) boxes of masks |
| Price Letter | The Price in USD payable for the Blue and Black masks shall be set out in a Price Letter dated on or around the date hereof. |
| Sizes | Standard Adult |

The Seller and Seller's Agent warrants that the Products sold will be new, unused and conform to the specifications reported by the Producer and as stipulated in this Agreement. Seller and Seller's Agent warrants that (i) it will convey to Purchaser good and marketable title to the Products, and (ii) all Products sold to Purchaser shall (a) be free and clear of all liens, claims and encumbrances, (b) have been properly stored, handled and transported until the time that ownership shall be transferred to Purchaser, and (c) shall be free of defects created by the negligence or misconduct of Seller and Seller's Agent or the Producer.

Seller and Seller's Agent shall facilitate the transfer of the Producer warranty of the Product to Buyer. Such manufacturer warranty shall be extended to the Buyer and Buyer's customers and/or end users for a period of one-year from the date title of the Product transfers to Buyer and/or its customers and end users.

2. Pricing and Delivery Terms. The Parties agree that the Product is sold on the pricing and delivery terms as set out below.

Weekly Delivery Schedule

| ITEM | DESCRIPTION | QTY PER WEEK | UNIT PRICE | TOTAL PRICE PER WEEK |
|---|---|---|---|---|
| 1 | Level 1 Blue Surgical Mask - 3 ply Dre Health Total defense 200 | 5,000,000 | To be set out in the Price Letter | Rate set out in the Price Letter multiplied by the quantity delivered per week |
| 2 | Level 1 Black Surgical Mask - 3 ply Dre Health Total defense 200 | 1,000,000 | To be set out in the Price Letter | Rate set out in the Price Letter multiplied by the quantity delivered per week |
| | | | Total | Total Price for the Blue and Black Masks set forth in Price Letter |

**Initial Deposit:** $3,000,000.00
**Additional Deposit:** $3,000,000.00

a) Seller's Agent and/or Producer will provide Buyer upon prior notice, with an estimated Delivery Schedule (Annex B) updated from time to time, so that a final date of each delivery of the Product to the delivery point (as mutually agreed upon by the Parties) (the "**Delivery Date**") can be agreed upon between the Parties.

b) Seller's Agent will confirm and agree upon each final Delivery Date with Buyer in order for transportation to be booked.

c) Buyer, or the Buyer's appointed representative or freight forwarder, will take responsibility for the Product from the delivery point to its final destination.

d) The Parties agree and understand that the risk of loss shall transfer to Buyer once Buyer has taken title of the Product at the delivery point. The Parties agree and understand that transfer of title shall occur when the Product is fully loaded onto Buyer's transportation from the delivery point.

3. Timing.
The Parties hereto agree to the following timing and events (other events and the timing associated our outlined hereafter, and this section is not intended to conflict with any other announced timing):

a. Buyer has received: (i) confirmation from the Seller and/or Seller's Agent that the Product is ready for shipment; (ii) the Product packing list; iii) a commercial invoice from Seller's Agent; and (iv) any other documentation reasonably requested by Buyer in connection with

the purchase, delivery, or specifications of the Product in relation to each individual orders invoiced to Buyer from Seller's Agent.

b. Upon execution of this Agreement the Initial Deposit shall be transferred to Producer's designated account within three (3) business day from the date hereof.

c. Upon Producer's receipt of the Initial Deposit, Buyer will receive confirmation and acceptance of availability of the Product for the agreed quantity and

d. Following satisfactory delivery of Five Million boxes which shall be within ten business days of the Initial Deposit being paid of the Product to Buyer, as Buyer shall determine in its reasonable discretion, Buyer shall then transfer the Additional Deposit to Producer within three (3) business days.

e. Following the transfer of the Additional Deposit to Producer, Buyer will pay for the remaining amounts of delivered Product to Seller's Agent following: (a) satisfactory inspection of the Product by Buyer; (b) receipt by Buyer of the documents set forth in subsection 3(a) above (c) satisfaction of any other applicable provision set forth herein, all in accordance with the delivery schedule set forth in Annex B. For clarification, payment of funds for each invoice made to Buyer from Seller's Agent are payable only following successful inspection of the Product by Buyer, in each instance or in connection with each individual order invoiced to Buyer.

f. Buyer will receive the Packing list for each truck containing the Product prior to shipment from Seller's Agent and Buyer will transfer funds to Seller's Agent pursuant to each certain invoice in relation to the Products available for collection following receipt of the documents set forth in 3(a), successful inspection of the Product and satisfaction of all other conditions set forth in this Agreement and in accordance with Section 4 hereof.

4. <u>Payment Terms.</u> The Product is sold on the payment terms as set out below.

| | |
|---|---|
| Payment Instruction - Initial Deposit<br><br>Payment Instrument – Products | Buyer will deposit ($ 6,000,000.00) in Producer's nominated account in accordance with this Agreement<br><br>The Buyer will transfer funds for the Products available for collection within one (1) business day of being provided:<br><br>• Confirmation product is ready to be collected;<br>• Packing list;<br>• Commercial invoice;<br>• Physical Inspection or time and dated video evidence of product availability; and<br>• Any other documentation reasonably requested by Buyer in connection with the purchase, delivery, or specifications of the Product in relation to each individual orders invoiced to Buyer from Seller's Agent. |
| Additional Details | To be confirmed |

| | |
|---|---|
| Estimated Delivery Date | In connection with the initial order, ten business days following receipt of Initial Deposit |

5. Initial and Additional Deposit

a. Following Producer's receipt of the Initial Deposit, Producer shall commence the manufacturing of the Products in accordance with the specifications set forth herein and annexed hereto and confirm a delivery schedule for such Product in the quantities and amount required herein with Buyer.

b. Following successful delivery of Five Million Boxes of Product to Buyer in accordance with this Agreement, Buyer shall send the Additional Deposit to Producer pursuant to 3(d) above. Producer shall credit to Buyer and apply the Initial and Additional Deposit made to Producer by Buyer to the final invoices of Product as determined in the delivery scheduled provided in accordance with subsection (a) above and Buyer shall remit to Producer any remaining amounts owed, if any following the application of the credit to such final invoices.

c. In the event Seller, Seller's Agent, or Producer breach this Agreement, or shall fail to deliver any Product in accordance with this Agreement, Buyer shall have the right to terminate this agreement upon 48 hours prior notice to Seller and Producer shall within 24 hours of such termination and remit the Initial and/or Additional Deposit back to Buyer. This termination right shall be in addition to any other rights or remedies available to Buyer under this Agreement or at law or in equity.

6. Specific Procedures and Performance Terms

a. Product proposed will meet the specification's outlined here in this Agreement and as set forth in Annex A.

b. The Product will be placed on pallets and stacked in quantities of 1,080 cases per pallet. Stacking quantities are to prevent damage to product cases during shipment. Any Special packaging agreed upon by Buyer may result in additional charges to the Buyer. Product is anticipated to be shipped to customer via 53' enclosed box truck as arrange by Buyer of Product.

c. Prices do not include local duties or taxes. All appropriate documentation to reduce the tax burden shall be provided to Seller or Seller's Agent from Buyer and/or all re-seller certifications shall be produced as required by either Party.

d. Delivery schedules and dates are given in good faith based upon the delivery times provided by our logistics team and freight forwarders. No penalty charges for deliveries outside of the time estimated will be accepted.

7. **Final Sales and Claims**

a. Seller and Seller's Agent represents and warrants that the Product that will be provided to Buyer shall be in accordance with the specifications provided in Annex A to this Agreement and that all goods delivered under this Agreement will be free from defects in design, material and workmanship, will conform to applicable standards, description, specifications and are suitable for the purpose intended.

b. All claims will be executed in writing and both parties agree to acknowledge such claims by written acceptance thereof.

8. **Non-Circumvention and Non-Disclosure**

a. The Parties irrevocably agree, and guarantee that neither Party shall directly or indirectly interfere with, circumvent or attempt to circumvent, avoid, bypass or obviate each other's interest, or the interest or relationship between the Parties with producers, sellers, purchasers, brokers, dealers, distributors, shippers, or manufacturers, to change, increase, or avoid directly or indirect payment of established or yet to be established fees, commissions, or continuance of pre- established relationship or intervene in un-contracted relationship with entrepreneurs, legal counsel, or initiate buy/sell relationships, or corporation, producer, technology owner, partnership, or individual revealed or introduced by one of the Parties to one another in connection with any on-going or future transactions or projects.

b. The Parties accept and agree to the provisions of the International Chamber of Commerce, USA for non-circumvention and non-disclosure with regards to all of the parties involved in this transaction and contract additions, renewals, and third-party assignments, with full reciprocation for a period of (1) one year from the date of execution of this Agreement.

9. The Parties shall keep this Agreement in strict confidence and shall instruct all persons involved in the completion of this contract to keep it in strict confidence.

a. "Force majeure" means: war, emergency, accident, fire, earthquake, flood, storm, industrial strike or any other fact or impediment that the affected party proves was beyond its control and that it could not have reasonably foreseen the facts at the time of the conclusion of this contract, or to avoid or overcome the facts, or to avoid or overcome its consequences.

b. The Parties shall not be responsible for the non-performance of this Agreement in case of Force Majeure, but int the event of Force Majeure, Seller must send immediately to the Buyer within 15 days of the incident by registered mail, a certificate of Force Majeure issued by competent government authority in the jurisdiction where the event of Force Majeure occurred as an evidence thereof.

c. Should the effect of the event Force Majeure continue for more than thirty (30) consecutive days, Buyer and Seller shall discuss their obligation to continue performance under the

terms and conditions of this Agreement. Both parties agree that an event of Force Majeure as governed and defined in the ICC (as hereinafter defined) will be applicable but not conclusive.

11. General Terms

a. Entire Agreement: This Agreement [and the executed DRE Health New Customer Application and the Incorporated Terms and Conditions of DRE at www.drehealth.com/terms-conditions-of-sale] represents the entire understanding and constitutes the entire agreement between the parties hereto with respect to its subject matter, and no other agreement, verbal or otherwise, will be binding between the parties hereto with respect to the matters referred to herein unless in writing and signed by the parties and supersedes any previous agreement between the parties with respect thereto and, without prejudice to the generality of the foregoing, excludes any warranty, condition or other undertaking implied at law or by custom, usage or course of dealing

b. Severability: In case any one or more of the provisions contained in this Agreement shall for any reason be held to be invalid, illegal, or unenforceable in any respect, such invalidity, illegality, or unenforceability shall not affect any other provisions of this Agreement, and will be construed as if such provision(s) had never been contained. No provision, requirement, or breach of this Agreement may be waived by any Party except in writing.

c. Assignment: Parties agree not to assign its rights, delegate or subcontract its duties and obligations under this Agreement without the prior written consent of all Parties, which may be withheld in either Parties reasonable discretion. Any attempt to do so will be considered a material breach of this Agreement.

d. Amendment: This Agreement may not be amended except in writing and signed by the parties hereto.

e. Successors: This Agreement will be binding upon and inure to the benefit of the parties hereto, their successors and permitted assigns, and no other person will have any right or obligation under this Agreement. A person who is not a party to this Agreement has no right to enforce any of its term except and to the extent (if any) where this Agreement expressly provides otherwise.

f. Waiver: No waiver of any provision of this Agreement will be implied from any course of dealing between the parties hereto and the rights and remedies of the parties shall not be affected by any failure to exercise or delay in exercising any right or remedy or by the giving of any indulgence by any other party or by anything whatsoever except a specific waiver or release in writing and any such waiver or release shall not prejudice or affect any other rights or remedies of the parties. No single or partial exercise of any right or remedy shall prevent any further or other exercise thereof or the exercise of any other right or remedy.

g. Signatures: All documents requiring signatures may be signed electronically and such versions shall be deemed legal and as if an original signature. Each signatory hereto represents and warrants that they are duly authorized to execute this Agreement and to bind whatever party on whichever's behalf they may sign.

h. Counterparts: This Agreement may be executed in any number of counterparts, each of which is an original and which together have the same effect as if each party had signed the same document.

i. Terminology: All trade terms in this Agreement will have the meanings assigned to them by the International Rules for the interpretation of Trade Terms (Incoterms 2010 Edition) and the ICC Rules of Documentary Credits subject to the Uniform Customs and Practice, ICC publication 600.

j. Governing Law and Jurisdiction: Any dispute, controversy or claim arising out of or in connection with this agreement, or the breach, termination or validity hereof, shall be settled by final and binding arbitration in accordance with the rules of Arbitration of the International Chamber of Commerce ("ICC") in force on the date of this agreement. The place of arbitration shall be Tulsa, Oklahoma, and the English language shall be used in the arbitral proceedings

k. Good Practices: The parties confirm and attest that they are NOT subject to any sanction, disbarment, restriction, and are currently in good standing with their representative license-granting authorities. The parties confirm that they will adhere to all U.S. Foreign Corrupt Practices Act (FCPA) provisions and anti-money laundering provisions.

l. Limitation of Liability: NEITHER PARTY SHALL BE LIABLE, DIRECTLY OR INDIRECTLY, FOR ANY (I) SPECIAL, INDIRECT OR CONSEQUENTIAL DAMAGES OF ANY KIND WHATSOEVER (INCLUDING WITHOUT LIMITATION LOST PROFITS), EVEN IF THE OTHER PARTY HAS BEEN ADVISED OF THE POSSIBILITY OF SUCH LOSSES OR DAMAGES AND REGARDLESS OF THE FORM OF ACTION.

m. Notice: Any notice, demand, consent, election, offer, approval, request, or other communication (collectively a "notice") required or permitted under this Agreement shall be in writing and shall be deemed given if (a) delivered personally, (b) sent by nationally-recognized overnight courier or mailed by registered or certified mail (return receipt requested), postage prepaid, or (c) sent by electronic mail transmission, in each case to the applicable Party at its address set forth in Section 1 (or to such other address that the receiving Party may designate from time to time in accordance with this Article). Any such notice or communication shall be deemed to have been delivered and received (i) in the case of personal delivery, on the date of such delivery, (ii) in the case of a nationally-recognized overnight courier in circumstances under which such courier guarantees next business day delivery, on the next business day after the date sent, (iii) in the case of mailing by registered or certified mail, on the third business day following that on which the piece of mail containing such communication is posted, and (iv) in the case of electronic mail transmission, on the date sent if either (A) confirmation of receipt is received or (B) a copy of such notice is transmitted to the recipient by one of the means described in subsections (a), (b) or (c) no later than three business days thereafter.

n. No Joint Venture: Nothing in this Agreement creates any agency, joint venture, partnership or other form of joint enterprise, employment or fiduciary relationship between the Parties. Buyer is an independent contractor pursuant to this Agreement. No Party has any express or implied right or authority to assume or create any obligations on behalf of or in the name of any other Party or to bind any other Party to any contract, agreement, or undertaking with any third party.

o. In the event of any conflict between the terms of this Agreement and the terms of any Invoice or Purchase Order, the terms of the Invoice or Purchase Order shall govern.

p. Buyer agrees to abide by and be bound by the terms of the New Customer Application it has executed.

**IN WITNESS WHEREOF,** the Parties have caused this Agreement to be duly executed as of the day and year first written above.

Signed for and on behalf of the Seller Agent
**DK Houck Enterprises, LLC**

[INTENTIONALLY DELETED]

By: ______________________
Name:Danny Houck
Title: CEO

Signed for and on behalf of the Buyer
**Berkley Equity Limited**

By: ______________________
Name: Anthony Lyons
Title: President

Signed for and on behalf of the Seller
**NativeAero Industries, LLC**

By: ______________________
Name: Lee Snider
Title: President

Signed for and on behalf of the Producer
**Dre Health Corporation**

By: ______________________
Name: Isaac Bawany
Title: CEO

## ANNEX A: PRODUCT SPECIFICATIONS

**Specifications**



DRE-DFM17

### DRE Health Disposable Face Mask Specifications



### Blue/Green/White Procedural/Surgical Mask with Latex Free Ear Loops

| MATERIAL | COLOR | SIZE(S) | PACK | COUNTRY OF ORIGIN |
|---|---|---|---|---|
| PP/SS NONWOVEN | BL, GR, W | ONE SIZE FITS ALL | 50/BX 20BX/CS | USA/PRC |

- LATEX FREE, FIBERGLASS FREE, FLUID RESISTANT
- 3-PLY (LAYERS) INCLUDING HEAVY-DUTY OUTER LAYER, FILTRATION LAYER, AND INNER LAYER.
- BACTERIA AND VIRUS FILTRATION EFFICIENCY OF 99.9% AVAILABLE
- MADE IN THE UNITED STATES AVAILABLE

PACKAGING SPECIFICATIONS (CUSTOM OEM PACKAGING AVAILABLE):

| MFG# | SIZE | BOX | BAG |
|---|---|---|---|
| DRE-DFM17 | ONE SIZE FITS ALL | 50EA | 50EA |

**ACCEPTANCES:** All DRE Health components comply with the provisions of the Federal Food, Drug, and Cosmetic Act which allow repeated use in direct contact with food, as well as CE, ISO, and other applicable certifications.

**ANNEX B**
**DELIVERY SCHEDULE**

Current delivery schedule of the initial order ten (10) business days after receipt of the Initial Deposit for completion of order.

Once the Initial Deposit is received a more precise schedule will be confirmed based on current orders in the system, but such schedule shall ensure that the quantity which is subject to this Agreement can be fulfilled by the Seller with the terms of this Agreement.

*Execution Copy*

**ADDENDUM TO SALE AND PURCHASE CONTRACT PACKAGE STRUCTURE AGREEMENT**

**THIS ADDENDUM TO SALE AND PURCHASE CONTRACT PACKAGE STRUCTURE AGREEMENT** (the "Addendum") is entered into this 19/10/21 day of October 2021, by and between DRE HEALTH CORPORATION ("Producer") on the one hand, and BERKLEY EQUITY LIMITED ("Buyer"), on the other hand. Buyer and Producer are each a "Party" and together "Parties" to this Agreement.

**RECITALS**

**WHEREAS**, the Parties entered into that certain Sale and Purchase Contract Package Structure Agreement dated September 2, 2021, as referenced by that certain e-mail agreement dated October 8, 2021 (collectively, the "SPA") the terms of which are further modified below;

**WHEREAS**, in connection with the delay of Product scheduled to be delivered on or before September 15, 2021 in accordance with SPA, and in consideration for Buyer agreeing to forbear from exercising certain of its rights and remedies with respect to such default by Producer, Producer agreed to deliver an additional Ten Million (10,000,000) boxes of Product to Buyer;

**WHEREAS**, as of the date hereof, Producer has remained unable to satisfy its obligations under the SPA, however, in consideration for the continued forbearance by Buyer of its rights and remedies under the SPA, Producer and Buyer desire to modify certain terms and conditions of the SPA, all as more particular set forth herein.

**NOW, THEREFORE**, in consideration of the sum of Ten Dollars ($10.00) and other good and valuable consideration paid by each party to the other, the receipt and sufficiency of which are hereby acknowledged, the Parties agrees as follows:

1. **Recitals**. The foregoing recitals are hereby incorporated into this Addendum by reference, as if fully set forth herein. Unless otherwise defined herein, all capitalized terms used in this Addendum shall have the meanings ascribed to them in the SPA, and all references in the SPA to the "SPA" or "this SPA" or "herein" or "hereunder" or similar terms shall mean the SPA, as modified by this Addendum.

2. **Amendments**. From and after the date hereof, the SPA is hereby amended as follows:

(a) Payments from Producer to Buyer for additional 10MM Dre Health Masks.

(i) On or before October 22, 2021 (the "Payment Date"), Producer shall wire Buyer, in immediately available funds, to the escrow account designated by Buyer, the amount of One Million Five Hundred Thousand and 00/100 ($1,500,000.00) Dollars (the "Payment") in consideration for the additional 10MM masks waiting to arrive in the port of Los Angeles that Producer is repurchasing from Buyer. In the event the First Payment is not made on or before the Payment Date, as liquidated damages, Producer shall pay to Buyer the amount of One Hundred Fifty Thousand and 00/100 ($150,000.00) Dollars per day for every day that the Payment is not made following the Payment Date, until the Payment is received by Buyer. Any damages are contingent upon Buyer's continued full performance under the SPA.

(ii) Deliveries of the products by Producer under the SPA are estimated to begin on or before October 31, 2021, provided Producer shall delivery to Buyer a delivery schedule for the Product during the six (6) month term in accordance with the SPA on or before October 19, 2021.

*Execution Copy*

(iii) The Parties hereby release and waive any claim against each other and its officers, agents and affiliates related to the 10 MM masks waiting to arrive in the port of Los Angeles that Producer is repurchasing from Buyer referenced in 2(a), provided notwithstanding the foregoing, the Parties acknowledge that the terms and conditions of this Addendum shall be enforceable in all respects and that the Parties are not releasing any claims with respect to the enforcement of the terms of this Addendum.

(b) Buyer Credits Earned in connection with the repurchase of 10MM Dre Health Masks by Producer.

(i) Contingent upon Buyer continuing to purchase masks under the SPA and meeting its obligations under the SPA, Buyer shall be credited by Producer a total of Six Million and 00/100 ($6,000,000.00) Dollars as follows:

(x) Three Million and 00/100 ($3,000,000.00) shall be applied to the Additional Deposit and Buyer shall be deemed to have made the Additional Deposit under the SPA in full satisfaction of its obligations therewith; and

(y) Three Million and 00/100 ($3,000,000.00) credit shall be applied towards amounts owed to Producer upon successful delivery of the Product beginning with the next shipment after the delivery to Buyer of the first twelve million boxes of masks in accordance with the SPA and as established by Producer and Buyer;

3. **Miscellaneous**.

(a) Except as herein amended, the SPA is hereby ratified and confirmed and shall continue in full force and effect, and all of the terms, covenants and conditions contained in the SPA shall remain in full force and effect.

(b) This Addendum shall bind and inure to the benefit of, and may be enforced by, the parties hereto and their respective successors and permitted assigns.

(c) To the extent the terms and provisions of this Addendum conflict with the terms and provisions of the SPA, the terms and provisions of this Addendum shall control.

(d) The parties each represents and warrants to the other that (i) the undersigned individual(s) executing this Addendum on its behalf are each fully empowered and authorized to execute this Addendum on its behalf.

(e) This Addendum with the SPA and the documents incorporated into the SPA represent the entire understanding and agreement among the parties with respect to the subject matter hereof. This Addendum shall only be amended, supplemented or otherwise modified by written instrument making specific reference to this Addendum and signed by both parties.

(f) This Addendum may be executed in counterparts, each of which shall be deemed an original, but all of which, together, shall constitute one and the same instrument. Delivery of the executed Addendum may be accomplished by facsimile transmission or transmission by email in pdf or similar format, and if so, the facsimile or electronic copy shall be deemed an executed original counterpart of this Addendum.

**[REMAINDER OF PAGE INTENTIONALLY LEFT BLANK]**

*Execution Copy*

DocuSign Envelope ID: 5C51C442-31F2-4CAF-9144-D736E035A6A2

*Execution Copy*

**IN WITNESS WHEREOF**, the parties hereto have duly executed this Addendum as of the date first above written.

PRODUCER:

**DRE HEALTH CORPORATION**

By:______________________________
Name: Isaac Bawany
Title: CEO

BUYER:

**BERKLEY EQUITY LIMITED**

DocuSigned by:

By:______________________________
Name: Anthony Lyons
Title: President
10/19/2021 | 6:56:21 AM PDT

63220/0001-41724974v5



EXHIBIT D

DRE +lealth

CC:

ANTHONY LYONS
CHAIRMAN
BERKLEY EQUITY, LTD. [NASSAU, BS]

# INVOICE 279722

+1(833)DRE-HEAL
+1(833)373-4325
Ext.700
INFO@DREHEALTH.COM

WWW.DREHEALTH.COM

Attention:
LEE SNIDER
PRESIDENT
NATIVEAERO
INVOICE DATE: 09/10/21

P.O. Number: N/A
Invoice (QUOTE) Number: 279722 - Rev.1b 9/15/21
Terms: $3M USD INITIAL SECURITY DEPOSIT DUE IMMEDIATELY. $3M USD ADDITIONAL DEPOSIT DUE BY 10/8/21 [AFTER INITIAL 2.5M BOXES DELIVERED]. ESTIMATED DELIVERY SCHEDULE ATTACHED. Payments are due in full upon cargo being available for pickup. Security deposit shall not be applied towards due amounts. Security deposit may be applied *only* towards the final deliveries against this Invoice or refunded to the customer after the contract has been completed. Buyer maintains option to renew for an addition 24-week period. Both parties maintain 60-day notice to cancel. If such notice is provided, deliveries will continue for 60 days and no penalties will be exercised on either party. If notice is not provided for any reason, DRE shall be entitled to apply security deposit amounts prepaid towards any damages experienced including prepayments to its vendors or higher-cost purchases made (if market declines) and refund any remaining amounts to the buyer. If DRE fails to meet its obligations (outside of a reasonable range of delay), it will be penalized per the damages caused for buyer to purchase alternative inventories at higher costs to fulfill orders to its customers on-time. Any such amounts shall be credited to the buyer. All sales final. Additional terms as outlined in sales terms & conditions available at www.drehealth.com. All prices are according to INCOTERMS FOB. If you choose to purchase delivery from us, INCOTERMS are DDU. Buyer is responsible for all customs duties, taxes, and additional fees. Products are not intended for invasive procedures or surgical use.

| Description | Quantity | UOM | Unit Price | Total Price ($USD) |
|---|---|---|---|---|
| DRE TOTALDEFENSEX200 3-PLY MASKS, 50/BX (L1) *(BLUE)* | 120,000,000 | BX | $ 1.100 | $ 132,000,000.00 |
| *(BLACK)* | 24,000,000 | BX | $ 2.200 | $ 52,800,000.00 |




EXHIBIT E

| Description | Quantity | UOM | Unit Price | Total Price ($USD) |
|---|---|---|---|---|
| SKU: VARIOUS<br>FOB | | | | |
| INSPECTION INCLUDED | | | Total Price | $ 184,800,000.00 |
| *TAX EXEMPT - FREIGHT<br>FOB KANSAS CITY, USA* | | | | |
| **TOTAL BALANCE** | | | | **$ 184,800,000.00** |

Thank you for *choosing DRE.*

Sincerely yours,

A. **Isaac Bawany**, Chief Executive Officer, DRE Health



EXHIBIT E

**DELIVERY SCHEDULE:**

| ESTIMATED CARGO READY DATE | QTY - BLUE | QTY - BLACK |
|---|---|---|
| 10/7 - 10/15 | 3,000,000 | 0 |
| 10/14 - 10/21 | 5,000,000 | 1,000,000 |
| 10/20 - 10/27 | 5,000,000 | 1,000,000 |
| 10/26 - 11/2 | 6,000,000 | 2,000,000 |
| 11/1 - 11/8 | 6,000,000 | 1,000,000 |
| 11/8 - 11/15 | 5,000,000 | 1,000,000 |
| 11/15 - 11/22 | 5,000,000 | 1,000,000 |
| 11/22 - 11/29 | 5,000,000 | 1,000,000 |
| 11/29 - 12/6 | 5,000,000 | 1,000,000 |
| 12/6 - 12/13 | 5,000,000 | 1,000,000 |
| 12/13 - 12/20 | 5,000,000 | 1,000,000 |
| 12/20 - 12/27 | 5,000,000 | 1,000,000 |
| 1/3 - 1/10 | 5,000,000 | 1,000,000 |
| 1/10 - 1/17 | 5,000,000 | 1,000,000 |
| 1/17 - 1/24 | 5,000,000 | 1,000,000 |
| 1/24 - 1/31 | 5,000,000 | 1,000,000 |
| 1/31 - 2/7 | 5,000,000 | 1,000,000 |
| 2/7 - 2/14 | 5,000,000 | 1,000,000 |
| 2/14 - 2/21 | 5,000,000 | 1,000,000 |
| 2/21 - 2/28 | 5,000,000 | 1,000,000 |
| 2/28 - 3/7 | 5,000,000 | 1,000,000 |
| 3/7 - 3/14 | 5,000,000 | 1,000,000 |
| 3/14 - 3/21 | 5,000,000 | 1,000,000 |
| 3/21 - 3/28 | 5,000,000 | 1,000,000 |





EXHIBIT E

BANK ACCOUNT FOR WIRE PAYMENT:

**PAYABLE TO (ELECTRONIC PAYMENTS):**

**DRE Health Corporation**

**CHECKS DELIVER TO:**

**DRE Health Corporation**

**C/O ACCOUNTS RECEIVABLE**

**5700 W. 112TH ST, STE. 300, LEAWOOD, KANSAS 66211 UNITED STATES OF AMERICA**

*JPMorgan Chase Bank, N.A.*

*Account Number: 609973919*

*Domestic: Wire Routing Transit Number (RTN/ABA): 103000648*

*International: SWIFT/BIC code: CHASUS33 ($USD)*

*Bank Address: 270 PARK AVENUE, NEW YORK, NY 10017 UNITED STATES OF AMERICA*

JONES DAY

77 WEST WACKER • SUITE 3500 • CHICAGO, ILLINOIS 60601 1692
TELEPHONE: +1 312 782 3939 • FACSIMILE: +1 312 782.8585

DIRECT NUMBER: (312) 269-4078
AWWIERS@JONESDAY COM

JP003834 November 1, 2021

VIA E-MAIL JGOODELMAN@COLESCHOTZ.COM

Jonathan Goodelman
Cole Schotz
25 Main Street
Hackensack, NJ 07601

Re: Monies Due From Berkley to DRE Health Under PSA & Invoice 279722

Dear Jonathan:

As you know, along with Mr. Eddie James, my Firm represents DRE Health. We are in receipt of the fully executed Sale & Purchase Contract between DRE and Berkley Equity Limited, dated September 2, 2021 ("the SPA"), amended by an Addendum dated October 19, 2021.

The executed SPA states in paragraph 11(o) on page 9 of 11 that in the event of any conflict on payment schedule or terms that the "terms of the Invoice or Purchase Order shall govern." I attach for your convenience DRE Health Invoice dated 279722, dated September 15, 2021, which relates to the masks to be delivered by DRE to Berkley under the SPA. The Invoice states in clear terms that payment is due "in full upon cargo being available for pickup." This is of course standard and widely accepted practice in the industry. Thus, and unambiguously, under the terms of the Parties' agreements, the monies due from your client are due in full upon cargo being available for pickup. Please be advised that the first shipment is available for pickup today and payment is therefore due. We understand that DRE also owes your client an additional $500,000 under the terms of the Addendum. Please accept this letter as our instruction that the $500,000 should simply be offset against the monies owed to DRE by your client now that the goods are ready for pickup. Thus, please remit payment to DRE in the amount of **$4,900,000**. ($5,400,000 minus the $500,000).

NAI-1522574293v1

Please let me know if any of this does not make sense. Thank you. DRE Health reserves all rights.

Very truly yours,

/s/ Adam W. Wiers

NAI-1522574293v1

JONES DAY

77 WEST WACKER • SUITE 3500 • CHICAGO, ILLINOIS 60601 1692
TELEPHONE: +1 312.782 3939 • FACSIMILE: +1 312.782 8585

DIRECT NUMBER: (312) 269-4078
AWWIERS@JONESDAY COM

JP003834 November 4, 2021

VIA E-MAIL JGOODELMAN@COLESCHOTZ.COM

Jonathan Goodelman
Cole Schotz
25 Main Street
Hackensack, NJ 07601

Re: DRE Health/Berkley SPA & Invoice 279722

Dear Jonathan:

We are becoming very concerned. After my letter of November 1st, and DRE's repeated offers to make concessions not required of them - for example, agreeing to accept payment on a per day basis rather than per week - the product continues to sit in DRE's warehouse and is not being picked up by Berkley. This is causing DRE stress on their storage capabilities (which in turn slows production since there is nowhere to put new product), along with financial concern, as we still do not have the due and owing payment for this very large shipment.

Product is available to pick up and my client has bent over backwards and spent untold dollars getting everything in order. Your client's supposed concerns about the location listed on the certificates is bizarre. They have the certificates; Kansas City is listed because that is where DRE has its headquarters and that is the location DRE's certificates always list. We are working to have new certificates issued that meet your peculiar specifications (not required by the SPA), but that will take a couple of days. And your client's repeated reference to factories and locations is perplexing as well, as there is no requirement in the SPA that the product be manufactured in a particular factory. DRE will stand behind its warranties of quality. The bottom line is that DRE is performing under this contract and insists that Berkley does as well. The product just needs to be picked up. Further delay only exacerbates problems, as production must slow.

We insist that Berkley arrange for payment and pickup immediately. Monies are owed to DRE. Interest will begin to accrue. All rights are reserved..

Very truly yours,

/s/ Adam W. Wiers

CC:

ANTHONY LYONS
CHAIRMAN
BERKLEY EQUITY, LTD. [NASSAU, BS]

# INVOICE 279723

+1(833)DRE-HEAL
+1(833)373-4325
Ext.700
INFO@DREHEALTH.COM

WWW.DREHEALTH.COM

Attention:
LEE SNIDER
PRESIDENT
NATIVEAERO
INVOICE DATE: 09/10/21

P.O. Number: N/A
Invoice (QUOTE) Number: 279723
Terms: 100% PAYMENT DUE UPON CARGO CUSTOMS CLEARANCE IN USA. ESTIMATED DELIVERY SCHEDULE ATTACHED. DRE will buy-back goods at buyer's request within 5 business days of cargo arrival at $1.10/bx. If buyback option is exercised, the amount due shall be either paid on NET 30 terms by DRE to buyer or credited towards billing for week 3 of PO 279722. All sales final. Additional terms as outlined in sales terms & conditions available at www.drehealth.com. All prices are according to INCOTERMS FOB. If you choose to purchase delivery from us, INCOTERMS are DDU. Buyer is responsible for all customs duties, taxes, and additional fees. Products are not intended for invasive procedures or surgical use.

| Description | Quantity | UOM | Unit Price | Total Price ($USD) |
|---|---|---|---|---|
| DRE TOTALDEFENSEX200 3-PLY MASKS, 50/BX (L1) *(BLUE)* | 10,000,000 | BX | $ 1.100 | $ 11,000,000.00 |
| *REBATE DISCOUNT CREDIT APPLIED TO PO 279722 WEEK 3* | | | $ 0.100 | $ 1,000,000.00 |
| SKU: VARIOUS FOB | | | | |
| INSPECTION INCLUDED | | | Total Price | $ 11,000,000.00 |
| *TAX EXEMPT - FREIGHT FOB LGB TERMINAL USA* | | | | |
| **TOTAL BALANCE** | | | | **$ 11,000,000.00** |

Thank you for *choosing DRE.*





EXHIBIT H

Sincerely yours,

A. **Isaac Bawany,** Chief Executive Officer, DRE Health



EXHIBIT H

**DELIVERY SCHEDULE:**

| ESTIMATED VESSEL ARRIVAL DATE | QTY - BLUE | QTY - BLACK |
|---|---|---|
| 9/27 | 5,000,000 | 0 |
| 10/3 - 10/6 | 5,000,000 | 0 |

BANK ACCOUNT FOR WIRE PAYMENT:

**PAYABLE TO (ELECTRONIC PAYMENTS):**

**DRE Health Corporation**

**CHECKS DELIVER TO:**

**DRE Health Corporation**

**C/O ACCOUNTS RECEIVABLE**

**5700 W. 112TH ST, STE. 300, LEAWOOD, KANSAS 66211 UNITED STATES OF AMERICA**

*JPMorgan Chase Bank, N.A.*

*Account Number: 609973919*

*Domestic: Wire Routing Transit Number (RTN/ABA): 103000648*

*International: SWIFT/BIC code: CHASUS33 ($USD)*

*Bank Address: 270 PARK AVENUE, NEW YORK, NY 10017 UNITED STATES OF AMERICA*

CHASE J.P.Morgan

DRE Health

BG INVESTMENTS




Case 4:22-cv-00031-RK Document 1-10 Filed 01/18/22 Page 1 of 1

EXHIBIT I